UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JACKSON WOMEN'S HEALTH
ORGANIZATION, ET AL.                                                    PLAINTIFFS

VS.                                        CIVIL ACTION NO.: 3:12cv436-DPJ-FKB

MARY CURRIER, M.D., M.P.H, ET AL.                           DEFENDANTS

ORDER

This matter is before the Court on Plaintiffs' Second Motion for Preliminary Injunction

[46]. After the Court's July 13, 2012 Order granting in part Plaintiffs' original Motion for

Preliminary Injunction, Plaintiffs unsuccessfully exhausted all available avenues to comply with

Mississippi House Bill 1390 ("the Act"). As such, the State has indicated that it will revoke the

Jackson Women's Health Organization's license following a hearing set for April 18, 2013.

Plaintiffs now ask the Court to preliminarily enjoin the State from going forward with license-

revocation proceedings. After considerable deliberation, the Court concludes that Plaintiffs are

entitled to preliminary injunctive relief. The State will be enjoined from enforcing the admitting

privileges portion of the Act.

I.        Facts and Procedural History

The Act requires that all physicians associated with abortion clinics have admitting and

staff privileges at a local hospital and be board certified in obstetrics and gynecology. At all

relevant times, Jackson Women's Health Organization ("JWHO" or "the Clinic") has been the

only abortion clinic in the State of Mississippi, and only one of its doctors holds admitting

privileges. That doctor has a separate, private OB/GYN practice and provides only minimal care

at the Clinic. The two doctors providing the vast majority of the Clinic's abortions lacked

admitting or staff privileges when the Act passed.

On June 27, 2012, Plaintiffs filed this lawsuit challenging the constitutionality of the Act against the head of the Mississippi Department of Health and the Hinds County District Attorney (collectively, for ease of reference, "the State"). That same day, Plaintiffs moved for a temporary restraining order to block the July 1, 2012 effective date of the Act. The Court entered a TRO on July 1, 2012, ordered additional briefing, and set a hearing on Plaintiffs' first Motion for Preliminary Injunction for July 11, 2012. Following the hearing, the Court entered an order granting in part and denying in part the motion for preliminary injunction. The Court allowed the Act to take effect, required Plaintiffs to continue to seek admitting privileges, and enjoined Defendants from exposing Plaintiffs to civil or criminal penalties for continued operation while privileges were being sought.

On November 28, 2012, Plaintiffs filed their Second Motion for Preliminary Injunction, reporting that the two doctors who provide the majority of the care at the Clinic had applied for privileges at every local hospital. Two hospital refused to provide applications, and all others rejected the doctors' applications because they perform elective abortions. Pls.' Mot. [46] Ex. A at App. 6–11. As a result, the State sent the Clinic an official notice of hearing for revocation of the Clinic's license to operate an abortion facility. It later stated that no waivers would be granted, so the result of the hearing is a foregone conclusion. The State will close the Clinic.

Plaintiffs now request "that the Court enjoin all forms of enforcement of the Admitting Privileges Requirement" of the Act and "respectfully request that the Court resolve this matter before the [State] holds an administrative hearing on revocation of the Clinic's license." Pls.' Mem. [47] at 2. Following an extended briefing period, the issues raised are now ripe for

consideration.

II.     Analysis

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*

*v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  To obtain this relief,

Plaintiffs must demonstrate four familiar requirements:

> (1) [a] substantial likelihood of success on the merits; (2) [a] substantial threat
> that plaintiff[s] will suffer irreparable injury; (3) [that the] injury outweighs any
> harm the injunction might cause the defendant[s]; and (4) [that the] injunction is
> in the public interest.

*Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001) (citing *Hoover*

*v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998)).  The Court finds that JWHO has met its burden.

   A.      Substantial Likelihood of Success on the Merits

        1.      The Applicable Standards

The Court must construe statutes in a way that "avoid[s] constitutional doubts."  *Stenberg*

*v. Carhart*, 530 U.S. 914, 941 (2000) (citation omitted).   In the abortion-regulation context, the

United States Supreme Court has developed the following legal framework:

> Before [fetal] viability, a State "may not prohibit any woman from making the
> ultimate decision to terminate her pregnancy."  It also may not impose upon this
> right an undue burden, which exists if a regulation's "purpose or effect is to place
> a substantial obstacle in the path of a woman seeking an abortion before the fetus
> attains viability."

*Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) (quoting *Planned Parenthood of Se. Pa. v. Casey*,

505 U.S. 833, 878, 879 (1992)).

Until recently, the State has agreed with JWHO that the Court must apply this undue-

burden analysis.  But now that the hospitals have denied admitting privileges, the State reverses

3

course, contending that the "undue burden analysis is inapplicable."  Defs.' Mem. [54] at 12

(capitalization altered).  Relying on *Gonzales v. Carhart*, the State asserts that "a mere rational

basis review pertains when a court considers a legitimate health and safety regulation of

abortion."  *Id*. at 13.  This argument finds little support in *Gonzales* or other post-*Casey* opinions

from the Supreme Court.

      *Casey* reaffirmed the state's "legitimate interests from the outset of the pregnancy in

protecting the health of the woman and the life of the fetus that may become a child."  505 U.S.

at 846.  Yet contrary to the State's current position, the Supreme Court did not stop there, noting

that "a statute which, while furthering the interest in potential life *or some other valid state*

*interest*, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be

considered a permissible means of serving its legitimate ends."  505 U.S. at 877 (emphasis

added).

      Though *Casey* was a plurality opinion, the United States Supreme Court has consistently

applied the undue-burden test, even when finding that a disputed law was adopted with a rational

purpose based on the state's legitimate interests.  For example, in *Gonzales*, the case upon which

the State relies, the Court observed:

> Where it has a rational basis to act, *and* it does not impose an undue burden, the
> State may use its regulatory power to bar certain procedures and substitute others,
> all in furtherance of its legitimate interests in regulating the medical profession in
> order to promote respect for life, including life of the unborn.

550 U.S. at 158 (emphasis added); *see also Stenberg*, 530 U.S. at 921 (summarizing *Casey*'s

undue-burden standard as establishing that "'a law designed to further the State's interest in fetal

life which imposes an undue burden on the woman's decision before fetal viability' is

unconstitutional" (quoting *Casey*, 505 U.S. at 877)); *see also Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 603 (6th Cir. 2006) (rejecting rational-basis test in admitting-privileges context).  In line with this precedent, the undue-burden test applies.

Having identified the controlling test, the Court next considers whether to apply it in an as-applied or facial context.  The two are dramatically different.  In a facial attack, a plaintiff ordinarily must demonstrate "that no set of circumstances exists under which [the Act] would be valid."  *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  It therefore comes as little surprise that regulations requiring admitting privileges have passed facial attacks in cases like *Greenville Women's Clinic v. Bryant* (*Greenville I*), 222 F.3d 157, 165 (4th Cir. 2000).  Indeed, this Act might survive a facial attack.  But "[i]t is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another."  *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (citation and quotations omitted).

Drawing this distinction is necessary because many of the State's arguments are built on cases addressing facial challenges.  *See, e.g.*, Defs.' Resp. [54] at 17 (noting cases holding that similar regulations "easily withstand a facial constitutional challenge"); *see also id.* at 29 (citing standards under facial challenge).  Nevertheless, the State correctly informed the Court during oral argument that this is an as-applied challenge because the law affects only this clinic and will force its closure.  *See* Hr'g Tr. at 48.[1]

---

[1]Another example of the State using arguments from facial attacks is the observation that abortionists cannot be elevated above other doctors.  *See Gonzales*, 550 U.S. at 163.  While true, *Gonzales* was a facial attack, and it noted that circumstances could occur in an as-applied context where the government's right to regulate medical practices gives way to a woman's constitutional right to a certain procedure.  550 U.S. at 167.

2.      As-Applied Constitutionality of the Act

The as-applied analysis in this case has proved shifty because the facts have evolved.

When the matter was first presented in JWHO's Motion for Preliminary Injunction, JWHO had

not yet applied for admitting privileges so its ability to comply was unknown.  For that reason,

the Court granted narrow injunctive relief and required Plaintiffs to seek privileges.  But even the

State recognized that JWHO's success in obtaining privileges could be determinative.  As the

State's counsel candidly noted in oral argument, "If they don't [receive admitting privileges], it's

going to cut against us, quite frankly, in my opinion."  *Id*. at 72.  That day has now arrived.  No

hospital would consider the applications, and the Clinic cannot comply with the Act.[2]

Though the State has essentially confirmed that it will revoke the Clinic's license, it

contends that no undue burden exists—assuming the Court rejects the rational-basis test the State

urges.  The State offers two arguments:  (1) the Act does not prevent abortions from taking place

_____

[2]Count Three of the Amended Complaint [30] asserts that the State violated JWHO's due process rights by delegating authority to the hospitals to determine whether the clinic can be licensed.  Those hospitals all denied admitting privileges, and most did so because the Clinic performs abortions.  The State acknowledges that under certain circumstances such delegation could cause due-process concerns.  Defs.' Resp. [54] at 29 (citing *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 117–18 (1928) (finding that delegation to non-governmental decisionmakers was "repugnant to the due process clause of the Fourteenth Amendment")).  But the State asserts that the delegation argument must fail because state law precludes arbitrary denials.  It then cites two cases that rejected the delegation argument.  *Id.* (citing *Baird*, 438 F.3d 595; *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 555–56 (9th Cir. 2004)).  Neither case supports the State's position.  The regulation in *Baird* survived because, unlike Mississippi's law, the regulation allowed waivers.  438 F.3d at 610.  *Eden* presented a facial attack where the court assumed privileges would not be denied.  379 F.3d at 555–56; *see also Greenville Women's Clinic v. Commissioner (Greenville II)*, 317 F.3d 357, 362–63 (4th Cir. 2002) (rejecting facial attack because plaintiffs held privileges and possibility of rejection was deemed "remote").  But while JWHO may have a valid due-process claim, it expressly reserved the claim in its Reply, which may indicate that it is somehow infirm.  The Court will stop here, but to avoid piece-meal adjudication, the Court advises Plaintiffs to assert their arguments if they deem them worthy.

in facilities providing fewer than ten abortions a month, such as physicians' offices and hospitals; and (2) Mississippi women seeking abortions have reasonable access to one of several abortion providers in neighboring states.

As to the first argument, the State has not identified any willing abortion providers other than the Clinic.  The record does, however, demonstrate that elective abortions are anathema to the policies of the hospitals in the Jackson metropolitan area, which prompted them to reject the doctor's applications out of hand.  Pls.' Mot. [46] Ex. A at App. 7–11.  And even the State seems to concede the "practical effect" of closing the Clinic is women in Central Mississippi may have to travel to another state to obtain abortions.  Defs.' Mem. [54] at 24.  Thus, on the record before the Court, the State has not demonstrated that the Act's ten-per-month caveat would actually remove the substantial obstacle closing the Clinic would cause.

On the second point, the State asserts that while the closure of the Clinic might make it "more difficult or more expensive" to obtain an abortion insofar as it requires travel to a neighboring state, that fact does not establish an undue burden.  Defs.' Mem. [54] at 23 (citing *Casey*, 505 U.S. at 874).  The State identifies at least four abortion facilities ranging from 121 to 209 miles from Jackson, asserts that closing the Clinic would "require an additional two to three hours of travel" for Mississippi women seeking abortions, and argues that this "[m]inimal additional travel is a minor inconvenience, not an unconstitutional 'undue burden.'"  *Id.* at 24 n.27.

The State builds this argument from the following statement in *Casey*:  "The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to

invalidate it." 505 U.S. at 874. But in the very next sentence, the Supreme Court states that a law will "reach into the heart of the liberty interest" "where state regulation imposes an undue burden on a woman's ability to make this decision . . . ." *Id.* An "[u]ndue burden" is "a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877. So the question remains whether closing the State's only abortion clinic creates a "substantial obstacle."[3]

There are two components to the "substantial obstacle" question in this case: (1) the mere burden of travel caused by closing the facility; and (2) the burden attendant to forcing travel to another state. The Supreme Court has never addressed the latter in a post-*Casey* opinion, and it has not directly answered the former. The closest case is *Mazurek v. Armstrong*, where the disputed law would not require women "to travel to a different facility than was previously available." 520 U.S. 968, 974 (1997). The Supreme Court viewed this fact as "strongly support[ing] the District Court's finding . . .that there was insufficient evidence that the law created a 'substantial obstacle' to abortion." *Id.*; *see also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981). Thus, the *Mazurek* Court viewed the possibility of travel to a different facility as a factor in the "substantial obstacle" analysis. And

_____

[3]As JWHO notes, *Casey*'s summary of the standards states, "Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." 505 U.S. at 878. How the term "unnecessary" factors into the analysis is not entirely clear because since *Casey* the Supreme Court has consistently proceeded to the purpose and effect side of the equation without considering whether a particular regulation is "unnecessary." In any event, the State did not address the issue in its response, and based on the present record, the Court agrees that JWHO has established a likelihood of success on the merits, even assuming a necessity inquiry.

here the closure will indisputably have that effect.  *Casey*, on the other hand, allowed a waiting period that could require some to make two trips to a clinic.  No clinics were closed as a result, but the Court held that "in the context of this facial challenge," and based "on the record before us," the additional travel was not an undue burden.  505 U.S. at 886–87.

Post-*Casey* and *Mazurek*, "[v]ery few courts have addressed whether requiring women to travel further for an abortion constitutes an undue burden."  *Baird*, 438 F.3d at 604.  The State relies on some of these cases to argue that travel is merely incidental.  Defs.' Resp. [54] at 25 (citing *Baird*, 438 F.3d at 598; *Greenville I*, 222 F.3d at 170; and *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526 (8th Cir. 1994)).  But none supports the argument.  *Greenville I* was a facial attack with a substantially shorter distance.  222 F.3d at 165.  *Schafer* involved no closures and merely found that calling ahead and driving was not an undue burden.  18 F.3d at 533.  In *Baird*, the court found that a trip of less than 55 miles—less than half the distances here—was not an undue burden.  But it also noted that "potential patients of the Dayton clinic could still obtain an abortion *in Ohio* and, more significantly, could obtain an abortion at a WMPC-owned clinic within a reasonable distance from the Dayton clinic."  438 F.3d at 605 (emphasis added).  Neither of the two *Baird* qualifiers exists in this case.  JWHO has but one facility.  And as the record now stands, the Clinic is the only known provider of abortions in the State.  Closing its doors would—as the State seems to concede in this argument—force Mississippi women to leave Mississippi to obtain a legal abortion.

Looking then to the interstate travel issue, the State offers no authority suggesting that closing its only identified abortion provider is a mere incidental effect.  As stated in *Okpalobi v. Foster*, "A measure that has the effect of forcing all or a substantial portion of a state's abortion

9

providers to stop offering such procedures creates a substantial obstacle to a woman's right to have a pre-viability abortion, thus constituting an undue burden under *Casey*." 190 F.3d 337, 357 (5th Cir. 1999) (citation omitted), *superseded on reh'g en banc on other grounds*, 244 F.3d 405 (5th Cir. 2001).[4]  That observation rings true because the State's position would result in a patchwork system where constitutional rights are available in some states but not others.  It would also nullify over twenty years of post-*Casey* precedents because states could survive the undue-burden test by merely saying that abortions are available elsewhere.

Finally, the Court notes that another judge in this district and division rejected this same argument when faced with an earlier attempt to close JWHO.  *See Jackson Women's Health Org., Inc. v. Amy*, 330 F. Supp. 2d 820, 823 (S.D. Miss. 2004) (Lee, J.) ("[T]he court is not persuaded that this burden is adequately ameliorated by the possible availability of abortions in surrounding states. . . . [P]laintiff has persuaded the court that the complete unavailability of early second-trimester abortions in Mississippi serves as a substantial obstacle to a woman's choice whether to seek such an abortion.").  The State has provided no basis for reaching a different result in this instance.  The Court concludes that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim.[5]

---

[4]*Okpalobi* was vacated on other grounds and therefore lacks precedential value.  *Pines Land Co. v. United States*, 274 F.3d 881, 894 (5th Cir. 2001).  It is, however, consistent with *Casey* and other authority.  *See Eden*, 379 F.3d at 541 ("A significant increase in the cost of abortion or the supply of abortion providers and clinics can, at some point, constitute a substantial obstacle to a significant number of women choosing an abortion.").

[5]Because of its conclusion as to the effect of the Act, the Court need not consider the thorny question whether public statements from numerous State officials lauding the Act as a ban on abortion in Mississippi are alone sufficient to demonstrate unconstitutional purpose.

B.      Substantial Threat of Irreparable Injury

The Fifth Circuit has explained the standard for establishing a substantial threat of

irreparable injury:

> a preliminary injunction will not be issued simply to prevent the possibility of
> some remote future injury.  A presently existing actual threat must be shown.
> However, the injury need not have been inflicted when application is made or be
> certain to occur; a strong threat of irreparable injury before trial is an adequate
> basis.

*United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001).  "Speculative injury is not

sufficient; there must be more than an unfounded fear on the part of the applicant."  *Holland Am.*

*Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).  On the other hand, "it is not

necessary to demonstrate that harm is inevitable . . . .  The plaintiff need show only a significant

threat of injury from the impending action, that the injury is imminent, and that money damages

would not fully repair the harm."  *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d

1390, 1394 (5th Cir. 1986).

Plaintiffs allege four imminent, irreparable injuries that would result if the Act is not now

enjoined:  (1) the impairment of the Clinic's patients' constitutional rights; (2) the interruption

and resulting permanent cessation of the Clinic's business; (3) reputational harms arising from

the license revocation proceedings; and (4) the potential that Dr. Doe's privacy and safety could

be compromised in the public revocation proceedings.  The State addresses only the first asserted

injury, leaving the others unrebutted in the record.  The third argument appears to have merit.[6]

---

[6]*See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
§ 2948.1 ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so
often is viewed as irreparable. . . . [And w]hen an alleged deprivation of a constitutional right is
involved, most courts hold that no further showing of irreparable injury is necessary." (footnotes
omitted)).

11

The second would have merit if closure occurred.  The Court will not address the fourth.

As to the Clinic's first argument, the parties agree that the April 18, 2013 hearing will result in an order to close the Clinic.  Nonetheless, the State contends that no irreparable harm would flow from that ruling until the Clinic fully exhausts its judicial appeals, presumably to the United States Supreme Court.  *See* Miss. Code Ann. § 41-75-23.  During oral argument, the State conceded that the Clinic's claim would become "ripe" upon notice of closure—an event that has now occurred.  And the only speculative, future event that could result in anything other than closure is a ruling from another court finding the Act unconstitutional based on the precise legal questions presented in this lawsuit.[7]

The Court does not believe the Clinic must exhaust its appeals in other fora before seeking injunctive relief.  *Cf. City Bank Farmers' Trust Co. v. Schnader*, 291 U.S. 24, 34 (1934) (holding that despite plaintiff's right to appeal in state court, where state "officers plainly intend to perform what they consider their duty, and will, unless restrained," take adverse action against plaintiff in alleged violation of due process, injury "appears sufficiently imminent and certain to justify the intervention of a court of equity"); *Humana*, 804 F.2d at 1394 ("Humana need not exhaust the administrative remedies available through HHS before seeking a preliminary injunction against Jacobson.").  The State has plainly informed the Clinic that it will be closed

---

[7]This matter falls outside the *Younger* abstention doctrine and the deference given pending state proceedings because the federal suit was filed first.  *Younger v. Harris*, 401 U.S. 37 (1971).  But if the case were to proceed into the state courts, it would further complicate the issues and potentially preclude further action in this venue.  *See* 28 U.S.C. § 1738; *Gammage v. W. Jasper Sch. Bd. of Educ.*, 179 F.3d 952, 954 (5th Cir. 1999); *see also Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) ("A preliminary injunction may be issued to protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision . . . .").

pursuant to a statute that appears to fail the undue-burden test.  Considering this, and the other articulated and unrebutted harms, the Court concludes that the irreparable injuries alleged are sufficiently imminent to justify preliminary injunctive relief at this time.

        C.      Balance of Harms and Public Interest

As for the final two factors for injunctive relief, the Court concludes that the threatened injury outweighs any harm that will result if the injunction is granted.  This order essentially continues the status quo.  Finally, the grant of an injunction will not disserve the public interest, an element that is generally met when an injunction is designed to avoid constitutional deprivations.  Plaintiffs have met the burden to establish entitlement to further preliminary injunctive relief.

III.     Conclusion

The Court has considered all the parties' arguments.  Those not specifically addressed would not have changed the result.  For the foregoing reasons, Plaintiffs' Second Motion for Preliminary Injunction [46] is granted.  Defendants are hereby enjoined from any and all forms of enforcement of the Admitting Privileges Requirement of the Act during the pendency of this litigation.  This Order does not affect other portions of the Act.

       **SO ORDERED AND ADJUDGED** this the 15th day of April, 2013.

                                    _s/ Daniel P. Jordan III_
                                      UNITED STATES DISTRICT JUDGE